IN THE CASE OF


UNITED STATES, Appellee

v.

Billy E. CAIN, Sergeant
U.S. Army, Appellant

No. 03-0212

Crim. App. No. 9800797

United States Court of Appeals for the Armed Forces

Argued October 22, 2003

Decided March 19, 2004


EFFRON, J., delivered the opinion of the Court, in which
GIERKE, BAKER, and ERDMANN, JJ., joined. CRAWFORD, C.J., filed
a dissenting opinion.



Counsel

For Appellant: Captain Rob W. MacDonald (argued); Colonel
Robert Teetsel, Lieutenant Colonel Mark Tellitocci, and
Major Allyson G. Lambert (on brief); Lieutenant Colonel E.
Allen Chandler, Jr., Major Imogene M. Jamison, and Captain
Mary E. Card.

For Appellee: Captain Edward E. Wiggers (argued); Colonel
Lauren B. Leeker, Lieutenant Colonel Margaret B. Baines, and
Major Natalie A. Kolb (on brief).



Military Judge: J. J. Smith




THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION.

Judge EFFRON delivered the opinion of the Court.

At a general court-martial composed of a military judge sitting alone, Appellant was convicted, pursuant to his pleas, of indecent assault (two specifications), in violation of Article 134, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. § 934 (2000). He was sentenced to a dishonorable discharge, confinement for five years, forfeiture of all pay and allowances, and reduction to Private E-1. Pursuant to a pretrial agreement, the convening authority approved a sentence providing for a dishonorable discharge, 24 months' confinement, forfeiture of all pay and allowances, and reduction to Private E-1. The Court of Criminal Appeals affirmed. United States v. Cain, 57 M.J. 733 (A. Ct. Crim. App. 2002).

On Appellant's petition, we granted review of the following issues:

    I.   WHETHER APPELLANT WAS DENIED THE FUNDAMENTAL RIGHT TO CONFLICT FREE AND EFFECTIVE ASSISTANCE OF COUNSEL WHEN THE LEAD DEFENSE COUNSEL AND APPELLANT ENGAGED IN A SECRETIVE HOMOSEXUAL RELATIONSHIP.

    II.  WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED WHEN IT DETERMINED THAT APPELLANT'S SEXUAL RELATIONSHIP WITH HIS LEAD DEFENSE COUNSEL DID NOT CREATE A CONFLICT OF INTEREST DENYING APPELLANT EFFECTIVE ASSISTANCE OF COUNSEL.

United States v. Cain, No. 03-0212/AR

For the reasons set forth below, we conclude that Appellant did not receive effective assistance of counsel and reverse.

## I. BACKGROUND

### A. COURT-MARTIAL PROCEEDINGS

1.  Assignment of defense counsel to represent Appellant

In October 1997, Appellant was charged with three specifications of forcible sodomy under Article 125, UCMJ, 10 U.S.C. § 925 (2000). The charges alleged that the offenses occurred between 1993 and 1995.

At the time of the first charged offense, Appellant was assigned to the Reserve Officer Training Corps (ROTC) Department at Norwich University in Vermont. The alleged victim was a male non-ROTC student at Norwich University. At the time of the second and third charged offenses, Appellant was serving at ROTC 1st Brigade Headquarters at Fort Devens, Massachusetts. The alleged victims were male civilians unconnected with Norwich University or the Army.

The military justice chain of command over Appellant included his brigade commander at Fort Devens, the summary court-martial convening authority; the Commander of the 1st Region (ROTC) at Fort Bragg, North Carolina, the special court-martial convening authority; and the Commander of the XVIII Airborne Corps at Fort Bragg, the general court-martial convening authority.

3

Civilian authorities began an investigation into similar charges in 1995. The brigade commander at Fort Devens, who informed his superiors at Fort Bragg of these matters, decided to let civilian authorities take the lead. The civilian authorities dismissed the charges in the spring of 1996, and the Army permitted Appellant to reenlist shortly thereafter.

Subsequent to Appellant's reenlistment, a new brigade commander was assigned to Fort Devens. The ensuing year was marked by growing tension between Appellant and the command, exacerbated by Appellant's allegations that the brigade commander and his executive officer were involved in sexual improprieties.

After Appellant submitted his allegations against the commander and executive officer, military authorities decided to reopen the investigation into the charges against Appellant that had been dismissed by civilian authorities. In the meantime, the brigade commander was relieved, but the renewed investigation into Appellant's activities continued apace. Charges were preferred against Appellant on October 15, 1997, and forwarded to the special court-martial convening authority at Fort Bragg.

The special court-martial convening authority appointed an investigating officer under Article 32, UCMJ, 10 U.S.C. § 832 (2000), to look into the allegations. The Article 32 hearing

4

was conducted at Fort Devens. Because Fort Devens did not have a trial defense office, the responsibility for detailing counsel to represent Appellant at the Article 32 hearing was exercised by Major S, the senior defense counsel at Fort Bragg. Major S assigned himself to represent Appellant during the Article 32 proceedings. The Article 32 proceedings and subsequent review by the chain of command resulted in referral of the charges on December 18, 1997, for trial by a general court-martial.

In January 1998, Appellant was assigned temporarily to Fort Bragg for the duration of the trial. During pretrial sessions in January, Appellant agreed to be represented at trial by Major S, adding that he was pursuing the possibility of representation by civilian counsel. He expressed concern with the large caseload facing defense counsel at Fort Bragg and the impact that it might have on his representation. He requested assignment of an additional counsel to assist Major S, noting that the prosecution already had two attorneys assigned to the case. In February, Major S detailed Captain L as assistant defense counsel and informed the military judge that Appellant would not be represented by civilian defense counsel. Appellant confirmed these arrangements on the record.

## 2. Pretrial motions

In February and March, the defense filed two motions to dismiss the case on procedural grounds. The first challenged

5

the delay in bringing the case to trial.  See U.S. Const. amend. V (due process) and Rule for Courts-Martial 907 [hereinafter R.C.M.] (speedy trial).  The military judge denied the motion. The defense filed a petition for extraordinary relief in the United States Army Court of Criminal Appeals on the same grounds, which was denied without prejudice to consideration of the matter during further proceedings.

The second motion alleged selective prosecution in violation of Appellant's due process and equal protection rights.  See U.S. Const. amend. V.  The motion noted that civilian authorities had dismissed the underlying charges against Appellant; that military officials knew of the charges when Appellant was permitted to reenlist in April 1996; that the charges were resurrected because the command believed that Appellant was homosexual; and that the charges were filed in retaliation for Appellant's "whistleblower" complaint against the command.  The military judge denied the motion.

3.   The plea agreement

In mid-May, the defense entered into negotiations with the Government, which resulted in a pretrial agreement.  Appellant agreed to plead guilty to two specifications of indecent assault in lieu of two of the forcible sodomy specifications.  The convening authority agreed to direct the trial counsel to dismiss the remaining forcible sodomy specification and to

disapprove any sentence greater than a dishonorable discharge, 24 months' confinement, forfeiture of all pay and allowances, and reduction to Private E-1.

At a court-martial session on June 2, Appellant entered pleas consistent with the pretrial agreement. The military judge conducted a detailed inquiry into the providence of Appellant's pleas. After concluding that the pleas were provident, the military judge entered findings consistent with those pleas, and sentenced him to a dishonorable discharge, confinement for five years, forfeiture of all pay and allowances, and reduction to Private E-1.

## B. POST-TRIAL DEVELOPMENTS

### 1.  Defense counsel's suicide

Two weeks after trial, a senior officer in the Army Trial Defense Service (TDS) visited Fort Bragg to investigate a professional conduct complaint that had been lodged against Major S. The complaint involved a matter distinct from his representation of Appellant. Major S, who was on leave in Chicago with his wife and son in preparation for an expected reassignment to Germany, returned to Fort Bragg alone to address the allegations. His reassignment had been tentatively placed on hold pending the results of the investigation.

Prior to meeting with Major S, the senior TDS officer visited the Staff Judge Advocate (SJA) of the XVIII Airborne Corps. The SJA showed the senior TDS officer a letter that had been sent to the convening authority by Appellant's parents. The letter, dated four days after the conclusion of trial, alleged that Major S had pressured the Appellant for sexual favors.

During a June 18 meeting with the senior TDS officer, Major S asked if there were potential delays that might affect his reassignment. In response, the senior TDS officer informed Major S of the allegations made by Appellant's parents. Major S, who was upset, denied the allegations. He expressed concern that a long delay could cause the cancellation of his reassignment to Germany, but he appeared to be resigned to the fact that the matter could not be resolved on the spot by the senior TDS officer.

Early the next morning, Major S took his own life. In a package of materials prepared for his personal attorney, Major S left a tape recording made shortly before his death. Although the recording did not provide detailed information about his relationship with Appellant or his conduct as lead defense counsel, it contained the following statements:

> I fully deny that I ever forcibly had sex
> with [Appellant] . . . .

> . . . .
>
> My suicide is not an admission of guilt . . . .
>
> . . . .
>
> I want you to know that my death is not an admission of any of the charges against me . . .
>
> . . . .
>
> Concerning [Appellant's] parents' allegation, that I forced their son to have sex with me, the allegation is preposterous . . . .

## 2. Assignment of a new defense counsel and the request for a post-trial inquiry

In July, the assistant defense counsel, Captain L, determined that he should disqualify himself from further representation of Appellant so that counsel not connected with Fort Bragg could represent Appellant during post-trial proceedings. On July 23, Captain H was detailed as Appellant's new defense counsel. On July 29, Captain L, although no longer representing the Appellant, signed the record of trial, which was authenticated on the same day by the military judge.

On July 30, the acting SJA prepared the post-trial recommendation to the convening authority required by R.C.M. 1106. The recommendation proposed approval of the adjudged sentence as modified by the pretrial agreement. The recommendation did not discuss the allegations made by Appellant's parents, the suicide of Major S, or any other

intervening events. Pursuant to R.C.M. 1106(f), the recommendation was served on Appellant and Captain H. The defense then requested, and was granted, an extension of time to file post-trial matters.

On September 11, 1998, Captain H submitted a discovery request for information concerning the representation of Appellant by Major S and his subsequent suicide. In the alternative, defense counsel requested an in camera inspection of evidence pertaining to that information by the military judge. The request was denied on September 16 on the grounds that Appellant was not entitled to post-trial discovery and that the military judge's authority to act on the case ended upon authentication of the record of trial.

Defense counsel filed another request on September 28, asking the convening authority to refer the matter to the military judge for a post-trial session under Article 39(a), UCMJ, 10 U.S.C. § 839(a)(2000). See R.C.M. 1102(d). The defense asserted that an inquiry by the military judge on the record was necessary to determine whether Appellant had been denied his right to effective assistance of counsel in light of alleged improper activities by Major S. In an analysis prepared for the convening authority, the SJA noted that the defense team had secured a favorable outcome for Appellant, that the asserted improper relationship had not created an actual conflict of

interest, and that a post-trial hearing would not serve any useful purpose in the absence of specific allegations by the defense of ineffective representation. In accordance with his SJA's recommendation, the convening authority rejected the request for further proceedings before the military judge on November 2.

On December 8, the defense submitted a post-trial memorandum under R.C.M. 1105 and 1106(f) for consideration by the convening authority. The memorandum emphasized the defense's continuing objection to the Government's refusal to release information regarding the events surrounding Major S's suicide. In addition, the defense contended that Appellant had not received effective assistance of counsel and that the deficiencies in representation rendered his guilty pleas improvident. The defense asked the convening authority to order a new trial. In addition, the defense proposed three alternative remedies: (1) issuance of an administrative discharge of Appellant in lieu of approval of the court-martial proceedings; (2) referral of the matter for review by the military judge in a post-trial session under Article 39(a); or (3) clemency through a reduction in sentence to time served, emphasizing a post-trial diagnosis of Appellant as HIV-positive.

The SJA advised the convening authority that the allegations of legal error were without merit and that the case did not

warrant either corrective action or clemency. On December 11, the convening authority adopted the SJA's recommendations and approved the sentence as modified by the pretrial agreement.

3.   The order for an evidentiary hearing

Over the next two years, Appellant continued to challenge the representation he had received at trial. On October 26, 2000, the Army Court of Criminal Appeals ordered an evidentiary hearing pursuant to United States v. DuBay, 17 C.M.A. 147, 37 C.M.R. 411 (1967). The DuBay hearing was held on May 14, 2001. The following section summarizes information from the DuBay proceedings and from the record of trial concerning the relationship between Major S and Appellant.

C. THE PERSONAL AND PROFESSIONAL RELATIONSHIP
BETWEEN MAJOR S AND APPELLANT

1.   The sexual relationship

Before he assigned himself to represent Appellant, Major S was aware of Appellant's homosexuality. According to Appellant, Major S had assisted him on another matter six years earlier. The assistant defense counsel at trial, Captain L, testified at the DuBay hearing that it was not unusual for Major S to involve himself in a case of this type because Major S was very interested in cases involving sexual misconduct or sex of any kind.

Major S initiated a sexual relationship with Appellant at the very outset of their attorney-client relationship in the present case.  In the fall of 1998, Appellant traveled to Fort Bragg for their initial meeting.  On the evening that Appellant arrived at Fort Bragg, Major S made sexual advances, which Appellant regarded as unwelcome and inappropriate.  In December, when Major S came to Fort Devens for Appellant's Article 32 hearing, he made further sexual advances, which led to acts of oral and anal sodomy between Major S and Appellant.

Subsequent to referral of charges for trial by general court-martial, Appellant learned that he was being transferred temporarily to Fort Bragg in January 1998 at the behest of Major S.  While at Fort Bragg, Appellant worked as an enlisted clerk-typist at the TDS office under the supervision of Major S.  He worked on the cases of other service members, as well as on his own, and also provided assistance to the ROTC program office.

In addition to his official duties, Appellant performed errands for Major S and frequently drove him to and from his home.  On more than one occasion, they engaged in sexual activity during these drives.  Another sexual encounter occurred in the TDS office.  Although the military judge presiding at the DuBay hearing expressed skepticism as to some of Appellant's testimony, he nonetheless concluded that Major S engaged in six

13

or seven acts of sodomy with Appellant during the period in which he served as counsel in the present case.

Major S did not manifest his homosexual activity to his colleagues. At the DuBay hearing, the judge advocate who served as trial counsel at Appellant's court-martial characterized Major S as "one of the last people I would think" was a homosexual. The assistant trial counsel at Appellant's court-martial described Major S as "a man's man" who "during the course of plea negotiations, . . . described . . . homosexual behavior in a less than favorable light . . . ." The assistant trial counsel added that "if you were to have asked that question at any point during the course of this, or any other case, . . . I probably would've laughed you out of the room."

2. The professional relationship

The DuBay record and the record of trial reflect various statements made by Appellant prior to adjudication of findings and sentence in which he expressed satisfaction with Major S as his attorney, often speaking in highly complimentary terms. When he approached Captain L in January to request his assistance with the case, Appellant said that Major S was doing a "great job." Later, Captain L recalled that Appellant had stated "that he was very grateful for the work [Major S] and I were doing and that he was very happy with us." When asked by

the military judge during the providence inquiry whether he was satisfied with his attorneys, he responded in the affirmative.

The information developed in the DuBay proceeding, however, indicates that Appellant had significant misgivings about Major S throughout the court-martial process.  Early in December 1997, Appellant contacted Mr. C, who worked on the staff of an organization providing assistance to service members affected by military policies related to homosexuality.  Because the organization did not directly represent persons before courts-martial, Mr. C referred Appellant to a civilian lawyer, Attorney W.  Mr. C also contacted Attorney W directly and advised her that Appellant appeared to be "distraught about the nature of his relationship" with Major S.  Mr. C also told Attorney W that when he suggested to Appellant that he report his concerns about Major S to the appropriate authorities, Appellant "expressed great fear of potential consequences should he expose Major [S's] misconduct."

Appellant contacted Attorney W per Mr. C's recommendation.  Attorney W did not discuss the underlying court-martial charges with Appellant, confining the conversation to "the problem in his relationship with defense counsel, Major [S]."  According to Attorney W, Appellant "was extremely tentative in tone, his voice quavered, and he rambled.  He described himself as frightened and depressed."

15

Appellant told Attorney W that Major S had a reputation as "an extremely talented defense attorney." Appellant "believed that no one but Major [S] could help him be exonerated by the court." Appellant added that Major S had told him that he "would receive a very long prison sentence if he, Major [S], were not his defense counsel."

According to Attorney W, Appellant was torn by conflicting emotions. On the one hand, the sexual relationship initiated by Major S, who was married and had a son, "caused him a great deal of distress, anxiety, and fear." On the other hand, "he was fearful of discontinuing the sexual relationship or reporting it because of his entrenched belief that he would spend a lengthy time in prison without Major [S] as his defense attorney."

Attorney W informed Appellant that Major S's actions were "unethical and illegal" and that the sexual contact "was potentially criminal under Articles 125 or 134 . . . , whether related to sodomy or indecent acts." She expressed concern "that this improper relationship could impair [Major S's] objectivity with regard to his representation" of Appellant.

Appellant "continued to plead that he believed that he would be unable to 'survive' this court without the assistance of Major [S] and that he would simply find himself with inferior counsel were he to report Major [S]." Attorney W attempted to convince Appellant that he should seek new counsel, even if he

16

did not report the misconduct of Major S to the authorities, but Appellant declined this advice. Appellant "reiterat[ed] his complete trust and dependence on [Major S's] legal skills, [and] he informed [Attorney W] that he did not believe he could take the risk of abandoning his [defense] counsel." According to Attorney W, "[i]t was apparent to me from my own experience as counsel and my conversation with him that he was incapable of rejecting [Major S's] professional services or his inappropriate advances because of the deep need of [Appellant] to believe his defense counsel could 'save' him."

Subsequent to his contact with Attorney W in December, Appellant expressed concern about his representation during the initial pretrial sessions of his court-martial. At the first pretrial session on January 15 -- well after Major S initiated sexual activity with Appellant -- the military judge provided Appellant with the standard advice as to his counsel rights, and inquired as to who would represent him. Appellant responded:

> I would like to retain Major [S]; but, due
> to the serious[ness] of the charges, I also
> -- I am new to the area, like I said. I
> just -- I just got here basically -- here
> this morning; and, if I had the means --
> that I'd also like to pursue a civilian
> counsel and have that right to look for that
> civilian counsel. Like I said, I am not
> from here. I am not familiar with the area
> or the legal people who are out there. So, I
> would like to retain, at the time being,
> Major [S], but I want the election to seek
> out legal, civilian counsel.

He then focused on the fact that the prosecution had assigned two judge advocates to the case:

> If -- if -- if the government also has two -- two prosecutors, I would ask that -- I've seen the case load, sir. I have some concerns that the defense counsel here on -- on Bragg -- being short the assigned attorneys that they have present -- I would -- I do not feel that I would get the full benefit of a -- of a government defense, with this case load.  This is a [sic] serious charges; and if this is being the case, Major [S] -- I know he is overloaded. I -- like I said, I may be from Massachusetts, but I've seen the case load that this office has.  I don't think that, at this time, that with Major [S's] case load or the trial defense, with the shortage of attorneys they do have present to help with my defense, that I would get that full benefit of the government providing that defense.

The military judge responded:

> Well, I can assure you that you would get a first class representation from the defense office here at Fort Bragg.  I've been a military judge here now since last July and I've seen most of the attorneys who work for the trial defense service here at Fort Bragg in trial many times.  They're very good at what they do and they are very conscientious; and, there is no question in my mind that you would get a first class representation.  However, as I read you your rights, you're free to go search for a civilian attorney that you'll pay for yourself . . . .

The military judge then directed Major S to assist Appellant in finding a civilian counsel.

18

Shortly thereafter, Major S met with a civilian lawyer, Attorney T, to discuss an unrelated case. Major S asked Attorney T if he would consider talking to Appellant. According to Attorney T, Major S stated that the case was "enormously complicated," adding that he needed "extra help," particularly in terms of investigating events in New England, as well as with negotiations with the convening authority aimed at having the charges dropped based upon unlawful command influence.

Attorney T met with Appellant on the evening of January 21 to discuss representation of Appellant at his court-martial. After obtaining assurances from Attorney T that any discussions preliminary to forming such an attorney-client relationship would be confidential, Appellant told the attorney that Major S had initiated a homosexual relationship with him shortly after Major S became his defense counsel. Attorney T told Appellant that the relationship was unethical, and that he would insist that the relationship cease if he became Appellant's counsel. Appellant responded that Major S was working hard and doing well with the case, and that although Major S was not his "type," the homosexual relationship had not become so burdensome that Appellant felt the need to terminate it.

Attorney T raised the possibility of disclosing the details of the illegal relationship to military officials with a view towards obtaining a dismissal of the case. Appellant responded

19

that he did not want to anger Major S or affect his career, and emphasized the confidential nature of the information.

During further discussions the next day, Attorney T reiterated his view that the actions of Major S were unethical. He added that he could take the case only if Major S was removed from the defense team. According to the attorney, Appellant was anxious to ensure that he not tell anyone, including Major S, that Appellant had divulged the homosexual nature of the relationship. Attorney T maintained the confidence of their preliminary discussions, and did not represent Appellant at his court-martial.

As the case moved towards trial on the merits in the spring of 1998, Appellant told a fellow soldier that "he was upset over the way his case was being handled" and revealed that Major S had required sexual favors of him. When asked why he did not get another attorney, he replied that "he was between a rock and hard place . . . [He] was not happy with [Major S], but he had gone so far with [Major S] that he could not turn back." His former roommate, in whom he also confided, described him as "distraught" and fearful of retaliation or additional charges if he revealed that he had been pressured into a sexual relationship. Appellant's mother gave a similar account.

Appellant consistently maintained to his defense team that he would not plead guilty to forcible sodomy. He asserted that

he had not engaged in any non-consensual sexual activity with the alleged victims. Major S believed that the allegations of forcible sodomy were false and also was inclined to view the case as a matter of consensual sodomy. His investigation of the case led him to conclude that there were substantial grounds for contesting the charges, taking the position that the evidence was stale, the victims had credibility problems, and there was evidence of improper bias by the command in terms of retaliation against Appellant for whistleblower activities. Until shortly before the case was resolved, he appeared intent on contesting all charges. As noted in Section I.A.2, supra, the defense twice sought dismissal of the charges on procedural grounds, which were rejected by the military judge.

In May of 1998, Captain L told Major S and Appellant that he viewed the prosecution as having a strong case, and he recommended that the defense initiate discussions with a view towards obtaining a pretrial agreement. Major S by then had alienated the prosecution to the point that he was not in a position to conduct such negotiations, so he delegated the task to Captain L. After a week of negotiations, the parties reached an agreement, and Appellant entered his guilty pleas to two specifications of indecent assault.

The military judge presiding over the DuBay proceedings found that there had been a sexual relationship between Major S

and Appellant throughout the period of representation. The military judge concluded that the relationship was not coerced, that it played no role in Appellant's decision to enter guilty pleas, and that it did not create a conflict of interest. The military judge also concluded that the defense team provided Appellant with effective counsel in terms of filing motions that challenged the government's case, advising the Appellant about the state of the evidence, and negotiating a favorable pretrial agreement. The Court of Criminal Appeals, which agreed with these conclusions, also concluded that Appellant waived any conflict of interest when he declined to follow the recommendation of two separate civilian attorneys to sever his relationship with Major S.

## II. DISCUSSION

### A. POTENTIAL CRIMINAL AND ADMINISTRATIVE ACTIONS RESULTING FROM THE CONDUCT BETWEEN THE ATTORNEY AND HIS CLIENT

Major S, the attorney, engaged in a course of conduct with Appellant, his client, which exposed both of them to the possibility of prosecution, conviction, and substantial confinement for the military crimes of fraternization and sodomy. An officer who violates the custom of the armed forces against fraternization with an enlisted person may receive a sentence that includes confinement for two years, a punitive

separation, and forfeiture of all pay and allowances.  See Article 134; Manual for Courts-Martial, United States (2002 ed.) [hereinafter MCM], Part IV, para. 83.(e).  Officers and enlisted members who engage in sodomy, even if not forcible, may receive a sentence for each offense that includes five years confinement, a punitive separation, and forfeiture of all pay and allowances.  Article 125; MCM, Part IV, para. 51.e.[1]

Fraternization and sodomy are not minor or obscure matters. The policies of the armed forces on both fraternization and homosexuality have been the subject of significant litigation and public controversy in recent years.  See, e.g., David S. Jonas, Fraternization: Time For A Rational Department Of Defense Standard, 135 Mil. L. Rev. 37 (1992); Jeffrey S. Davis, Military Policy toward Homosexuals: Scientific, Historical, and Legal Perspectives, 131 Mil. L. Rev. 55 (1991).  Less than five years before Appellant's trial -- while both Major S and Appellant were members of the Army -- the executive and legislative branches of government engaged in a highly publicized review of the policies pertaining to homosexuality in the armed forces. See National Defense Authorization Act for Fiscal Year 1994,

---

[1] A constitutional challenge to sodomy as a criminal offense in the military is currently before this Court in another case, United States v. Marcum, 59 M.J. 131 (C.A.A.F. 2003)(pet. granted), and we express no opinion at this time as to whether such a challenge would or should prevail.  Our discussion of the potential penalties for sodomy in the current case reflects the provisions of the MCM in effect at the time of trial.

Pub. L. No. 103-160, § 571(a)(1), 107 Stat. 1670 (codified at 10 U.S.C. § 654); H.R. Rep. No. 103-200, at 286 (1993); S. Rep. No. 103-112, at 263 (1993). This debate culminated in the passage of legislation, signed into law by the President, which declares that "[t]he presence in the armed forces of persons who demonstrate a propensity or intent to engage in homosexual acts would create an unacceptable risk to the high standards of morale, good order and discipline, and unit cohesion that are the essence of military capability." 10 U.S.C. § 654(a)(15). The legislation mandates discharge of any service member who has engaged in a homosexual act, subject to narrowly drawn exceptions. Id. at § 654(b). As a result, even if not prosecuted for sodomy in a court-martial, the conduct initiated by Major S exposed him and Appellant to administrative proceedings that could have resulted in involuntary termination for homosexuality. Moreover, Major S would have faced the possibility of a discharge for soliciting and committing homosexual acts "with a subordinate in circumstances that violate customary military superior-subordinate relationship." Dep't of the Army Regulation (AR) 600-8-24, Officer Transfers and Discharges (Feb. 3, 2003) para. 4-22h(3)(current version substantively identical to the version in effect at trial).

B. ETHICAL CONSIDERATIONS

In addition to potential criminal or administrative action for misconduct as an Army officer, Major S engaged in conduct that subjected him to the possibility of additional disciplinary action for violation of the ethical rules applicable to attorneys in the Army. Rule 1.7(b) of the Army Rules of Professional Conduct for Lawyers prohibits representational conflicts of interest, specifying that "[a] lawyer shall not represent a client if the representation of that client may be materially limited . . . by the lawyer's own interests . . . ." AR 27-26, Army Rules of Professional Conduct, Appendix B (May 1, 1992). Rule 1.2(d) states that "[a] lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent." Id.

With respect to sexual activity between attorneys and clients, civilian jurisdictions have taken a variety of positions on whether there should be a complete prohibition during an ongoing attorney-client relationship, or whether sexual activity should be prohibited only in specified circumstances. See, e.g., Abed Awad, Attorney-Client Sexual Relations, 22 J. Legal Prof. 131 (1998). The Army has endorsed the views of the American Bar Association Standing Committee on Ethics and Professional Responsibility, as expressed in Formal Opinion 92-364 (1992) [hereinafter ABA Formal Op. 92-364]. See

25

United States v. Cain, No. 03-0212/AR

Army Office of the Judge Advocate General Standards of Conduct Office, Professional Responsibility Notes, 1993 Army Law. 48 (August 1993)(quoting ABA Formal Op. 92-364 in full).  The ABA opinion observed that sexual relations between an attorney and client --

> may involve unfair exploitation of the lawyer's fiduciary position and presents a significant danger that the lawyer's ability to represent the client adequately may be impaired . . . . The roles of lover and lawyer are potentially conflicting ones as the emotional involvement that is fostered by a sexual relationship has the potential to undercut the objective detachment that is often demanded for adequate representation.

Id. at 49.  The ABA opinion also observed that --

> the client may not feel free to rebuff unwanted sexual advances because of fear that such a rejection will either reduce the lawyer's ardor for the client's cause or, worse yet, require finding a new lawyer, causing the client to lose the time and money that has already been invested in the present representation and possibly damaging the client's legal position.

Id. at 51.  See Colorado v. Good, 893 P.2d 101, 104 (Colo. 1995) (quoting ABA Formal Op. 92-364); see also Restatement (Third) of Law Governing Lawyers, § 16, Comment e (2000)("A lawyer may not . . . enter a sexual relationship with a client when that would undermine the client's case, abuse the client's dependence on the lawyer, or create risk to the lawyer's independent judgment . . . .")

26

### C. THE IMPACT OF CRIMINAL CONDUCT AND ETHICAL VIOLATIONS ON THE CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

Members of the armed forces facing criminal charges, like their civilian counterparts, have a constitutional right to effective assistance of counsel.  U.S. Const. amend VI.  Our Court reviews claims of ineffective assistance of counsel de novo.  United States v. Key, 57 M.J. 246, 249 (C.A.A.F. 2002)(applying the two-prong test established by the Supreme Court in Strickland v. Washington, 466 U.S. 668, 687 (1984): "First, the defendant must show that counsel's performance was deficient. . . .  Second, the defendant must show that the deficient performance prejudiced the defense.").

 An attorney's violation of the canons of legal ethics does not necessarily render the attorney's assistance ineffective. Nix v. Whiteside, 475 U.S. 157, 165 (1986).  In some circumstances, the "high probability of prejudice" and the "difficulty of proving that prejudice" require the application of a rule that the conduct is inherently prejudicial.  See Mickens v. Taylor, 535 U.S. 162, 175-76 (2002)(citing Cuyler v. Sullivan, 446 U.S. 335, 348-49 (1980); Holloway v. Arkansas, 435 U.S. 475, 490-91 (1978)(cases involving multiple concurrent representation)).  The Court emphasized in Mickens, however, that "[n]ot all attorney conflicts present comparable

27

difficulties," and that most cases will require specifically tailored analyses in which the appellant must demonstrate both the deficiency and prejudice under the standards set by Strickland. 535 U.S. at 175-76.

When an attorney has engaged in criminal misconduct similar to the conduct at issue in Appellant's trial, the federal courts have taken different approaches on the question of whether there is inherent prejudice or whether prejudice must be specifically demonstrated. Compare United States v. Cancilla, 725 F.2d 867 (2d. Cir. 1984)(not requiring a demonstration of specific prejudice) with Cerro v. United States, 872 F.2d 780 (7th Cir. 1989)(requiring the presence of specific facts to trigger a finding of prejudice); cf. Government of the Virgin Islands v. Zepp, 748 F.2d 125, 136 (3d. Cir. 1984)("[I]t is unrealistic for this court to assume that Zepp's attorney vigorously pursued his client's best interest entirely free from the influence of his concern to avoid his own incrimination.").

In United States v. Babbitt, 26 M.J. 157 (C.M.A. 1988), our Court considered the impact on the effective assistance of counsel in a case where a male civilian defense attorney engaged in a consensual sexual act with his female military client during the evening before the final day of her trial. In those circumstances, our Court declined to hold that every sexual relationship between an attorney and client necessarily creates

a conflict of interest that violates a client's Sixth Amendment right to the effective assistance of counsel.  Id. at 158-59.

### D. THE COMBINATION OF POTENTIAL CRIMINAL LIABILITY AND ETHICAL MISCONDUCT

The appeal before us presents a case of first impression, with no direct counterpart in civilian law.  The case involves a volatile mixture of sex and crime in the context of the military's treatment of fraternization and sodomy as criminal offenses.

Defense counsel's conduct with his client placed both the attorney and client at the risk of criminal prosecution for violating the very article of the UCMJ, Article 125, that was the subject of the present case.  Well before the onset of trial, Major S repeatedly placed himself at risk of severe personal and professional consequences, including the possibility of confinement by court-martial, administrative termination of his military career, and professional discipline. The extraordinary pressure under which he labored during his representation of Appellant is underscored tragically by the fact that he took his own life less than a day after he was informed that his superiors had learned of his personal relationship with Appellant.

Because of counsel's suicide, we do not have the benefit of any testimony that he might have provided as to what consideration he gave potential defense strategies in this case. In the absence of such testimony, we consider the case from the perspective of a military defense counsel caught between the conflicting pressures generated by his own sexual misconduct and his professional responsibilities. By his actions, counsel placed himself and his client in a position where testimony by the client entailed significant risks. Any exploration into Appellant's conduct would have raised the possibility that the prosecution would have endeavored through cross-examination or rebuttal to elicit evidence of similar sexual misconduct. This would have created the potential for exposing counsel's sexual misconduct with Appellant.

In those circumstances, defense counsel faced a conflict between his personal interests and his responsibility to give thoughtful, dispassionate consideration and advice concerning the range of options facing the defense. We do not know whether the defense counsel in this case rejected any specific option on the grounds that it was not in his client's best interest, or because it was not in his own best interest. We do know that when confronted about the sexual misconduct with his client, it was only a matter of hours before he took his own life.

The uniquely proscribed relationship before us was inherently prejudicial and created a per se conflict of interest in counsel's representation of the Appellant. The facts of this case are distinguishable from the limited, consensual relationship between a civilian counsel and his client that we considered in Babbitt, where we declined to find such a per se conflict. 26 M.J. at 158-59. Here, we confront a course of conduct involving an attorney's abuse of a military office, a violation of the duty of loyalty, fraternization, and repeated commission of the same criminal offense for which the attorney's client was on trial. All of this is left unexplained due to the attorney's untimely death. As stated by the Second Circuit in Cancilla, the conflict created by this conduct was "real, not simply possible" and "so threatening as to justify a presumption that the adequacy of representation was affected." 725 F.2d at 870.

The problems flowing from the conduct of Major S are not overcome in this case by actions of the assistant defense counsel, Captain L, who negotiated the pretrial agreement. Major S was the experienced, lead counsel in the case. Appellant relied on Major S and was entitled to the benefit of conflict-free advice from Major S about the range of alternatives before him. He did not receive that advice.

With respect to waiver, we note that the court below relied on Appellant's discussions with two civilian lawyers, Attorney W and Attorney T, in concluding that he waived any objection to Major S as his counsel. Both attorneys advised him to sever the relationship because the behavior of Major S was unethical. Neither attorney, however, provided him with a detailed explanation of the relationship between the merits of the case and the attorney's ethical obligations. Both focused on the matter from the attorney's perspective, not the client's perspective. Attorney W declined to discuss the substance of the charges with Appellant, and Attorney T focused primarily on the fact that he would not take the case if Major S remained on it. We do not fault either attorney for not engaging in a detailed discussion with Appellant of the impact of any unethical behavior by Appellant on the merits of his case. In both cases, the discussions between the apparently distraught Appellant and the cautious lawyers simply did not advance to the point of forming an attorney-client relationship with respect to the charged offenses. Appellant's conversations with the two civilian attorneys in this case did not involve the type of informed discussion of the specific pitfalls of retaining Major S that would demonstrate a knowing, intelligent waiver of the right to effective assistance of counsel. See United States v. Henry, 42 M.J. 231, 237 (C.A.A.F. 1995).

32

DECISION

The decision of the United States Army Court of Criminal Appeals is reversed.  The findings of guilty and sentence are set aside.  The record of trial is returned to the Judge Advocate General of the Army.  A rehearing may be ordered.

<u>United States v. Cain</u>, No. 03-0212/AR

CRAWFORD, Chief Judge (dissenting):

I respectfully dissent from the majority's creation of a per se rule of ineffectiveness that is contrary to Supreme Court precedent. <u>Mickens v Taylor</u>, 535 U.S. 162, 172-73 (2002) (noting that because there is no rule of per se ineffectiveness, an appellant must demonstrate that "conflict significantly affected counsel's performance"). <u>But cf.</u> <u>Nixon v. Florida</u>, 857 So. 2d 172 (Fla. 2003)(defendant's acquiescence in defense counsel's strategy which was the functional equivalent of a guilty plea, regardless of its wisdom, was held to be per se ineffectiveness), <u>cert. granted</u>, 2004 U.S. LEXIS 1643 (March 1, 2004). This Court is, and should be, deeply concerned about an accused's right to effective assistance of counsel and a fair trial. Nevertheless, to determine whether counsel has rendered ineffective assistance to an accused, we are bound by our own and Supreme Court precedent. This precedent dictates that ineffective assistance requires <u>both</u> deficient performance <u>and</u> prejudice. Because Appellant has demonstrated no prejudice in this case, I respectfully dissent from the lead opinion.

"In reviewing claims of ineffective assistance of counsel based on deficient representation, we must apply the two-prong test articulated by the Supreme Court in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984)." <u>United States v. Babbitt</u>, 26 M.J. 157, 158 (C.M.A. 1988).

> First, the defendant must show that <u>counsel's performance was deficient</u>.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance <u>prejudiced the defense</u>.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Strickland</u>, 466 U.S. at 687 (emphasis added).  The Court added that "if it is easier to dispose of an ineffectiveness claim <u>on the ground of lack of sufficient prejudice</u>, which we expect will often be so, that course <u>should be followed</u>."  <u>Id.</u> at 697 (emphasis added).

The type of conflict presented in this case is not unique to the military.  In fact, there have been many federal cases addressing ineffectiveness where the client and attorney were allegedly involved in a related criminal endeavor.  <u>See, e.g.</u>, <u>United States v. Cancilla</u>, 725 F.2d 867 (2d Cir. 1984)(attorney participated with client's coconspirators in crime similar to client's); <u>United States v. Briguglio</u>, 675 F.2d 81 (3d Cir. 1982)(attorney under investigation by United States Attorney's Office prosecuting client).  To assess ineffectiveness in these cases, the courts have rejected a per se rule and, instead, have examined the record to determine if there was prejudice.  Unlike the instant case, in none of the federal cases was there the mitigating presence of an independent counsel, or a guilty plea

2

tested through the extensive providence inquiry required in military practice.

Appellant in the case at bar has failed to demonstrate any prejudice. Despite his admission of guilt to the charge of indecent assault, Appellant availed himself of a pretrial agreement which reduced the charges and limited the duration of the adjudged confinement. Indeed, Major S's representation successfully gave Appellant the benefit of his bargain and, as the lower court noted, "it is difficult to imagine what more [the defense] could have done on [Appellant's] behalf to produce a more favorable result." United States v. Cain, 57 M.J. 733, 739 (A. Ct. Crim. App. 2002). In addition, the pretrial agreement which dictated the outcome of the case was negotiated by Captain L, who was unaffected by Appellant's relationship with Major S. The mitigating presence of an independent third party counsel who reviewed and endorsed the vehicle which secured Appellant's fate at trial renders prejudice simply untenable. In sum, given the absence of any prejudice in this case, there simply cannot have been ineffective assistance.

Moreover, this Court has repeatedly emphasized the military judge's obligation to ensure that guilty pleas are voluntary and pretrial agreements are well understood. Rule for Courts-Martial 910. See, e.g., United States v. King, 3 M.J. 458 (C.M.A. 1977)(holding that the military judge must confirm at

3

trial that the written plea agreement encompasses both parties' understanding of the meaning and effect of the plea bargain). Indeed, "[t]he military justice system imposes even stricter standards on military judges with regards to guilty pleas than those imposed on federal civilian judges." United States v. Perron, 58 M.J. 78, 81 (C.A.A.F. 2003). Only after meeting this stringent prerequisite may a military judge pronounce the binding effect of the pretrial agreement on both parties. United States v. Lanzer, 3 M.J. 60, 62 (C.M.A. 1977)(noting that pretrial agreements will be strictly enforced where the intention of the parties at the time of the agreement is clear). This Court's exacting standards in this regard prompted the Judicial Conference of the United States to recommend that other federal courts require its judges to conduct a similar inquiry into plea agreements. Judicial Conference of the United States Committee on Rules of Practice and Procedure, Report of the Advisory Committee on Criminal Rules, 65 Crim. L. Rep. (BNA) 140 (May 5, 1999).

The detailed providence inquiry in this case, informed by Appellant's binding stipulation of fact, is abundantly clear that Appellant knowingly and willingly pleaded guilty to the charged offense, knowingly and willingly entered the pretrial agreement, and was indeed satisfied with the assistance of counsel that accompanied his decision to plead guilty and enter

4

the pretrial agreement.  See United States v. Redlinski, 58 M.J. 117, 119 (C.A.A.F. 2003)(noting that this Court considers the context of the entire record to determine whether a plea was provident).  The military judge questioned Appellant, in pertinent part, as follows:

    MJ: Anyone force you to enter into this agreement?

    ACC: No, Your Honor.

    . . . .

    MJ: Anyone made any promises to you that aren't written into this agreement in an attempt to get you to plead guilty?

    ACC: No, Your Honor.

    . . . .

    MJ: . . . Paragraph 4 [of the pretrial agreement] says that the offer to plead guilty originated with you; and, that no person made any attempt to force or coerce you into making this offer.  That just means it was your idea.  Was it?

    ACC: Yes, it was, Your Honor.

    . . . .

    MJ: Have you had enough time to discuss this agreement with both of your defense counsel?

    ACC: I have, Your Honor.

    MJ: Are you satisfied with their advice regarding this pretrial agreement?

    ACC: I am, Your Honor.

    MJ: And, again, I ask you, did you enter into the agreement of your own free will?

ACC: I did, Your Honor.

MJ: Did anybody force you to do this?

ACC: No, Your Honor.

. . . .

MJ: You fully understand all of the terms and conditions [of the pretrial agreement] and how they are going to affect your case?

ACC: I do, Your Honor.

. . . .

MJ: Are you satisfied [with your defense counsels'] advice with regard to your case?

ACC: I am, Your Honor.

MJ: Satisfied with them as your defense counsel?

ACC: Yes, Your Honor.

MJ: Are you pleading guilty voluntarily and of your own free will?

ACC: I am, Your Honor.

MJ: Anyone made any threat or tried in any way to force you to plead guilty?

ACC: No, Your Honor.

. . . .

MJ: Sergeant Cain, I find that your plea of guilty is made voluntarily and with full knowledge of its meaning and effect.

I further find that you have knowingly, intelligently and consciously waived your rights against self-incrimination, to a trial of the facts by a court-martial and to be confronted by the witnesses against you.

      Accordingly, your plea of guilty is provident. It is accepted.

Given this Court's longstanding efforts to ensure that guilty pleas are sincere and voluntary, and that only legitimate, mutually-selected pretrial agreements are put into effect, this Court is remiss to reverse Appellant's conviction – and in so doing negate his accepted guilty plea and rescind his binding pretrial agreement – in the absence of any prejudice.

      Finally, even if Appellant had suffered prejudice, he affirmatively waived his right to conflict-free representation when he freely and deliberately entered into a relationship with his defense counsel. See United States v. Mezzanatto, 513 U.S. 196, 201 (1995)(establishing that an appellant may waive many of the most fundamental constitutional rights). "The determination of whether there has been an intelligent waiver . . . [depends] upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." Johnson v. Zerbst, 304 U.S. 458, 464 (1938). The lower court made extensive findings of fact regarding the consensual, informed, and deliberate nature of Appellant's relationship with Major S:

- Appellant was 33-years-old, a sergeant with more than 12 years of service, with a GT score of 112 and a two-year associate's degree.

- Appellant told several people that he continued the relationship only because <u>he</u> wanted defense counsel to continue to represent him.  Appellant considered defense counsel to be an "excellent, dynamic, and aggressive" attorney, and believed that because counsel was gay, like Appellant, counsel would fight even harder on Appellant's behalf.  Appellant believed Major S was the best military defense counsel available.

- Appellant never told defense counsel that he had any reservations about their relationship.  Appellant testified at the hearing pursuant to <u>United States v. DuBay</u>, 17 C.M.A. 147, 37 C.M.R. 411 (1967), "[N]ot once did I protest what he was doing to me or what he had me do to him."

<u>Cain</u>, 57 M.J. at 735.  There was no doubt that Appellant <u>wanted</u> Major S to defend him, and did what he felt was necessary to secure Major S's "excellent, dynamic, and aggressive" representation.  <u>Id.</u>  Indeed, "Appellant knew what he was doing when he made his choice."  <u>Id.</u> at 739.  In short, through his calculated involvement with his defense counsel, Appellant waived his right to conflict-free representation.

For these reasons, I respectfully dissent from the lead opinion.