# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
SCHENCK, ZOLPER, and WALBURN
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant JOHN R. WILLIAMSON, JR.**
**United States Army, Appellant**

ARMY 20030855

U.S. Army Air Defense Artillery Center and Fort Bliss
Mark P. Sposato, Military Judge
Lieutenant Colonel Tracy A. Barnes, Staff Judge Advocate

For Appellant: Major Charles L. Pritchard, Jr., JA (argued); Colonel Mark Cremin, JA; Lieutenant Colonel Mark Tellitocci, JA; Major Allyson G. Lambert, JA (on brief); Lieutenant Colonel Kirsten V.C. Brunson, JA (on supplemental and reply briefs).

For Appellee: Captain Ryan R. McKinstry, JA (argued); Lieutenant Colonel Mary M. Foreman, JA; Lieutenant Colonel Natalie A. Kolb, JA (on brief).

25 July 2007

-------------------------------------
OPINION OF THE COURT
-------------------------------------

SCHENCK, Senior Judge:

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of wrongfully possessing 3.79 pounds of marijuana with intent to distribute, in violation of Article 112a, Uniform Code of Military Justice, 10 U.S.C. § 912a [hereinafter UCMJ]. The convening authority approved the adjudged sentence to a bad-conduct discharge, confinement for two years, and forfeiture of all pay and allowances. This case is before the court for review pursuant to Article 66, UCMJ.

Appellant asserts several assignments of error. Two, alleging Sixth Amendment violations, require discussion, but merit no relief. Specifically, appellant contends he was denied his Sixth Amendment right to effective assistance of counsel because his defense team, consisting of detailed military counsel and civilian defense counsel, failed to move to suppress the marijuana as the "fruit of an unlawful search." We disagree and hold that appellant has not shown such a motion

would have been meritorious and, therefore, has not met his burden of demonstrating a deficiency with resulting prejudice. Appellant also contends the military judge erred by admitting a laboratory report (identifying the substance appellant possessed as marijuana) as a business record pursuant to Military Rule of Evidence [hereinafter Mil. R. Evid.] 803(6). He argues the military judge's ruling contradicts the Sixth Amendment Confrontation Clause requirements set forth in *Crawford v. Washington*, 541 U.S. 36 (2004),[1] because the laboratory report is testimonial in nature. We agree and hold that, under the circumstances of this case, the laboratory report is testimonial under *Crawford* and, therefore, was improperly admitted under Mil. R. Evid. 803(6). We further find, however, the military judge's error in admitting the laboratory report was harmless beyond a reasonable doubt.

**FACTS**

In August 2003, appellant was convicted of wrongfully possessing 3.79 pounds of marijuana with intent to distribute, on or about 27 November 2002, for possessing a box containing three bundles of marijuana, which he received through Federal Express while he was on leave in New Orleans, Louisiana. At trial, the government called Detective (Det.) Joel Pena from the El Paso, Texas, Police Department during its case-in-chief. Without defense objection, the military judge recognized Det. Pena "as an expert in the field of narcotics interdiction . . . to include distribution and transportation." Detective Pena, then assigned to a Drug Enforcement Administration (DEA) Task Force, testified regarding the seizure and controlled delivery of the marijuana that ultimately led to appellant's arrest. Detective Pena's testimony was consistent with and supplemented by his affidavit supporting the request for a search warrant (admitted into evidence as Prosecution Exhibit (P.E.) 3 without defense objection), and by the DEA Task Force police report (admitted into evidence as Defense Exhibit (D.E.) R without government objection).

---

[1] Appellant's court-martial was completed in August 2003, and *Crawford* was decided on 8 March 2004. Since military appellate cases are considered pending on direct review, the "new rule of criminal procedure" announced in *Crawford* applies retroactively to appellant's case. *See Whorton v. Bockting*, __ U.S. __, __, 127 S. Ct. 1173, 1181–84 (2007); *Griffith v. Kentucky*, 479 U.S. 314, 328 (1987) ("We . . . hold that a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past."); *United States v. Cabrera-Frattini*, 65 M.J. 241, 245 (C.A.A.F. 2007) (stating same); *United States v. Foerster*, 65 M.J. 120, 122 n.3 (C.A.A.F. 2007) (stating same).

WILLIAMSON – ARMY 20030855

On 25 November 2002, Det. Pena was part of a three-officer DEA Task Force working at the El Paso International Airport. El Paso Police Department Officers Sal Vargas and Douglas Fairbanks[2] completed the team. During the day, the officers conducted a drug interdiction operation in the Federal Express outbound freight terminal. They chose outbound freight because law enforcement agencies generally consider El Paso a narcotics source city due to its location near the Mexican border. Oftentimes, freight leaving El Paso contains narcotics for distribution in other cities.

While at the Federal Express terminal, Officer Fairbanks was using his drug detection dog, "JB," to sniff outbound packages for narcotics. The DEA Task Force team became suspicious of a particular outbound package because JB alerted on a box, which was on the ground with several other packages. Affixed to the box was a "FedEx USA Airbill®"[3] that, in Det. Pena's opinion, contained obviously incomplete information; sender and recipient telephone numbers were missing, and the sender identified the recipient only as "Will" without including a last name. Detective Pena commented that "most people . . . sending . . . an article to someone else . . . will [include] a full name" on the Airbill.®

Once the DEA Task Force team "determined the box was suspect," the team moved the box from the Federal Express terminal to the DEA Task Force office near the airport. At the office, Det. Pena personally prepared an affidavit and a warrant application to obtain a warrant to search the box and seize its suspected illegal contents, i.e., narcotics.

In his affidavit supporting the request for the search warrant, Det. Pena asserted the following facts under oath:

> There is in El Paso County, . . . inside the El Paso DEA Task Force Office[,] . . . one (1) cardboard box, wrapped in brown paper, sealed with clear tape.
>
> . . . .

---

[2] Officer Vargas testified only during the Article 32, UCMJ, investigation. Officer Fairbanks did not testify before any proceeding in this case.

[3] A FedEx USA Airbill® is a shipping label used on packages shipped within the United States. FedEx, *at* https://www.fedex.com/us/services/documents/airbill.html (last visited 23 July 2007).

It is the belief of [the] affiant . . . that [the box contains] . . . marijuana, cocaine, heroin and methamphetamine.

Affiant has probable cause for the said belief by reason of the following facts, to wit: . . . Officer Douglas Fairbanks is employed as a police officer by the City of El Paso and has been so employed for the past 15 years. Off[icer] Fairbanks's K-9 partner, "JB," is a six (6) year old male chocolate Labrador Retriever. K-9 "JB" was tested under standards set forth by the North American Police Work Dog Association (NAPWDA), and the National Narcotic Detector Dog Association (NNDDA) and was certified by both associations to detect the odor of marijuana, cocaine, heroin and methamphetamine. Canine "JB" has been working in the El Paso area along with Officer Fairbanks for the past six months and since that time has alerted successfully on over 40 occasions where narcotics or narcotic related currency has been seized.

Officer Fairbanks was utilizing his narcotics detector canine "JB" to sniff through the freight for the presence of narcotics. At approximately 1440 [hours], Officer Fairbanks advised the affiant that canine "JB" alerted on the above described box for the scent of narcotics. The box was on the ground with several other boxes at the time of the alert.

Detective Pena testified that, in his opinion, he thought the drug dog, JB, was certified, and made that assertion in his affidavit. On cross-examination, however, he stated he learned after the Article 32 investigation that JB was not certified. When civilian defense counsel asked Det. Pena about this "misinformation," Det. Pena said he gave the judge who issued the warrant the information "in good faith [and i]t's not like I knew beforehand and I [was] trying to mislead the judge."[4] On redirect, Det. Pena stated: "JB [has] been around for a while. . . . [O]ur dogs are

---

[4] Civilian defense counsel also cross-examined Det. Pena regarding other aspects of the search warrant. Trial counsel objected to the line of questioning, and the military judge stated on the record: "There is no motion on the warrant, so I will give you latitude, but do we need to have an Article 39(a) session?" Civilian defense counsel responded: "I don't think we need to have one."

certified on a yearly basis and it's a team effort. It's the canine and the officer that go through various tests . . . ."

Once Det. Pena obtained the search warrant at the courthouse, he told Officers Vargas and Fairbanks they could open the box. When Det. Pena returned to the DEA Task Force office, he saw that the box contained "rolls of toilet paper" and "bundles of marijuana wrapped in black tape." The bundles of marijuana were "secured onto the toilet paper [rolls] with the duct tape." Consistent with his testimony on the merits, in both the inventory section of the search warrant and in his police report, Det. Pena described the property seized as "three (3) bundles of marijuana with the gross approximate weight of 4.95 pounds."[5] In accordance with "police department policy," no DEA Task Force team member tested the marijuana at the office, but they "knew it was marijuana . . . based on [their] knowledge and experience with marijuana," the "way it was packaged[,] and how it was wrapped." Detective Pena and Officers Vargas and Fairbanks kept the marijuana in their continuous custody— approximately five hours—until they transferred it for the controlled delivery in New Orleans.

After repackaging the marijuana and rewrapping the box[6]—to preserve its original condition for the controlled delivery—Det. Pena gave the box to Sheila Ryan, a U.S. Postal Inspector. Ms. Ryan immediately shipped the box to Det. Jacque using U.S. Postal Service Express Mail® next-day delivery. Detective Jacque was also assigned to a DEA Task Force in his jurisdiction. Detective Jacque picked up the box from the post office, locked it in the police station vault, and obtained a search warrant for the address written on the FedEx USA Airbill.® Ten to fifteen minutes after the controlled delivery was made, Det. Jacque and other officers executed the search warrant.

During the delivery, Det. Donald Nides of the New Orleans DEA Task Force posed as a Federal Express deliveryman. Upon arrival at the residence, Det. Nides spoke with Ms. Quillen, appellant's sixty-two-year-old grandmother. After announcing he had a package for "Mr. Will," Ms. Quillen responded, "Yeah. John

---

[5] Consistent with Det. Pena's testimony, Det. Wayne Jacque of the New Orleans Police Department (narcotics section) testified he also weighed the three marijuana bundles and found they weighed "more than [three] pounds."

[6] On redirect examination, Det. Pena said he had been involved in "hundreds" of investigations like the one in this case, which included "opening" packages he suspected contained narcotics, "repackage[ing]" them, and "ship[ping them] out" for controlled deliveries.

Williamson," and called appellant and told him "he had a package." "It's your package, John," she said. Detective Nides said he needed a signature and Ms. Quillen responded, "He can sign it. John? Come sign this, baby." Detective Nides apologized for the late delivery and told appellant, "Just sign your name right there. We will definitely send his money back to him, because it's our fault." Responding to Det. Nides' comment about late delivery, appellant said, "Thank you. . . . Oh, yeah, because I called to get a--[.]" Appellant accepted the package and signed a document acknowledging its receipt. Detective Nides departed the area.[7]

Ten to fifteen minutes later, Det. Jacque and other officers executed the search warrant. Detective Jacque knocked on the door, and when Ms. Quillen answered, he advised her he had a search warrant and entered the house. Shortly thereafter, Det. Jacque found appellant in an upstairs bedroom. As the detectives entered the bedroom, Det. Jacque said he saw appellant "raising himself from the bed . . . and[,] also on the bed and in the immediate area where [appellant] was[,] was the control delivered package. . . . [Appellant] appeared shocked and nervous." After appellant was detained on the first-floor in the living room, Det. Jacque retrieved the box with its contents from the upstairs bedroom and confronted appellant with the seized contraband.

When confronted in his grandmother's presence, appellant maintained his "shocked and nervous" demeanor. He also remained quiet and said nothing. When Ms. Quillen left the living room, appellant gave several explanations why someone would send a box of marijuana to his house. According to Det. Jacque, appellant stated "he was expecting some CDs in the mail." Then appellant said "he had a friend in El Paso, Texas[,] that told him that he was going to mail him a package to his house," but appellant never asked the friend what he was sending, and did not reveal the friend's name to Det. Jacque. Detective Demond Lockhart, another member of the New Orleans DEA Task Force, heard appellant say "he had a friend that was into marijuana and that could have been a friend that mailed him that package," but he did not reveal that friend's name either, and that "he didn't know anything about anything," intimating he could have been set up. When Ms. Quillen reentered the living room, appellant's demeanor changed; he became "more embarrassed and ashamed in front of his grandmother."

---

[7] These conversations with Det. Nides were monitored and recorded for officer safety reasons. Without defense objection, assistant trial counsel played for the panel during trial the recorded conversations that occurred during delivery of the package. The military judge admitted the recording into evidence as P.E. 28, and the panel had it during its deliberations on the merits.

6

When he testified during the defense case on the merits, appellant denied arranging with anyone to ship marijuana to him. When he received the box, appellant was "excited." After appellant signed for the box, he said he took the box upstairs, put it on the bed, and started to open it. Before he could get the box open, however, appellant said the police were already in the house and detained him. It was only after being detained that Det. Jacque showed appellant the contents of the box and laid the contraband on the living room coffee table. Appellant told the officers he did not know who sent the box, where it came from, could not have possibly known the contents, and suggested someone had set him up.

Detectives Jacque and Pena testified that when a person possesses between three and four pounds of marijuana, he possesses with intent to distribute it; that large an amount is not for personal use. After appellant's arrest, the New Orleans Police Department retained the marijuana in its custody. Through two stipulations of expected testimony—agreed to personally by appellant and entered into evidence without defense objection as P.E. 11 and P.E. 12—and testimony from two U.S. Army Criminal Investigation Command (CID) special agents, the government demonstrated a chain of custody accounting for the marijuana from the time it left the New Orleans Police Department, passed through the Fort Polk and Fort Bliss CID offices, and ultimately arrived at the U.S. Army Criminal Investigation Laboratory (USACIL)[8] in Forest Park, Georgia, for forensic chemical analysis testing. Without defense objection, the military judge entered into evidence as P.E. 8 a chain of custody document listing specific dates and all law enforcement personnel who handled the marijuana. Special Agent (SA) Hector Hernandez from the Fort Bliss CID office testified regarding the accuracy of the information contained in this document. Special Agent Hernandez also told the panel he had been a CID special agent for five years; prior to becoming a special agent, he had been a military police investigator for four years.

After a senior forensic chemist at the USACIL tested the marijuana, he generated a report confirming the substance submitted for testing was, in fact, marijuana and weighed 1,375.69 grams (or 3.03 pounds). At trial, the government moved to admit the laboratory report over defense objection. Specifically, trial defense counsel argued: (1) the laboratory report was not properly self-

---

[8] Although the USACIL is a division of the CID (the Army's law enforcement branch), the USACIL does not function as a prosecution support tool; rather, by its own mission statement, USACIL exists to render *neutral* support to the CID by "examin[ing] crime-related evidence to *assist investigators in solving crime*." U.S. Army Criminal Investigation Command, *at* http://www.cid.army.mil/mission2.htm (last visited 23 July 2007) (emphasis added).

authenticating under Mil. R. Evid. 902(4a) (self-authenticating documents or records of the United States accompanied by an attesting certificate); (2) testimony from an expert witness involved in the testing process was necessary to lay a proper foundation for the laboratory report; (3) a chain of custody for the marijuana and the laboratory report was not properly established; and (4) the laboratory report constituted inadmissible hearsay, contrary to Mil. R. Evid. 803(6) (hearsay exception for records of a regularly conducted activity, i.e., "business records").  In ruling on the defense objections, the military judge made the following findings: (1) the laboratory report was properly self-authenticating under Mil. R. Evid. 902(4a); (2) expert-witness testimony was not required to lay a foundation for the laboratory report; (3) a chain of custody was properly established; and (4) the laboratory report was a properly-authenticated business record, and, as such, was admissible under Mil. R. Evid. 803(6).

## INEFFECTIVE ASSISTANCE OF COUNSEL

### Law

*Right to Effective Assistance of Counsel*

The United States Constitution's Sixth Amendment guarantees an accused the right to "effective assistance of counsel." *United States v. Cronic*, 466 U.S. 648, 654 (1984); *United States v. Cain*, 59 M.J. 285, 294 (C.A.A.F. 2004); *United States v. Russell*, 48 M.J. 139, 140 (C.A.A.F. 1998); *United States v. Dobrava*, 64 M.J. 503, 505 (Army Ct. Crim. App. 2006); *see also* UCMJ art. 27 ("[D]efense counsel shall be detailed for each general and special court-martial [and] . . . must be certified as competent to perform [defense] duties . . . .").

We review an appellant's ineffective assistance of counsel claims de novo. *United States v. Key*, 57 M.J. 246, 249 (C.A.A.F. 2002); *United States v. Wean*, 45 M.J. 461, 463 (C.A.A.F. 1997).  To establish such a claim, "appellant must show not only the deficiency in counsel's performance, but how that deficiency prejudiced his defense." *Dobrava*, 64 M.J. at 505 (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and *United States v. Edmond*, 63 M.J. 343, 345, 350–51 (C.A.A.F. 2006)).  Specifically, "to prevail, the [accused] must show both that counsel's representation fell below an objective standard of reasonableness, . . . and that there exists a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986) (internal citation omitted); *Edmond*, 63 M.J. at 351 (stating same).

Furthermore, our retrospective review of counsel's representation is "'highly deferential,'" and reinforced by "'a strong presumption[9] that counsel provided adequate professional service.'"  *United States v. Paxton*, 64 M.J. 484, 488 (C.A.A.F. 2007) (quoting *Edmond*, 63 M.J. at 351); *United States v. Shaw*, 64 M.J. 460, 463 (C.A.A.F. 2007) (recognizing the "long-standing principle that counsel is presumed to be competent"); *United States v. Garcia*, 59 M.J. 447, 450 (C.A.A.F. 2004); *United States v. Grigoruk*, 56 M.J. 304, 306–07 (C.A.A.F. 2002); *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987).  Our superior court set forth the following three-question test to determine whether the presumption of competence has been overcome:

> (1) Are the allegations made by appellant true; and, if they are, is there a reasonable explanation for counsel's actions in the defense of the case? (2) If they are true, did the level of advocacy "fall[] measurably below the performance . . . [ordinarily expected] of fallible lawyers"? (3) If ineffective assistance of counsel is found to exist, "is . . . there . . . a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt?"

*United States v. Christian*, 63 M.J. 205, 210 (C.A.A.F. 2006) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)) (alterations in original); *United States v. Haney*, 64 M.J. 101, 106 (C.A.A.F. 2006) (stating same).  Moreover, where two or more defense counsel have represented an appellant, "we evaluate the performance of the defense team as a unit," *United States v. McConnell*, 55 M.J. 479, 481 (C.A.A.F. 2001), rather than focus on individual counsel's efforts or shortcomings. Nevertheless, "[c]ounsel cannot be 'ineffective' unless his mistakes have harmed the defense (or, at least, unless it is reasonably likely that they have).  Thus, a violation of the Sixth Amendment right to *effective* representation is not 'complete' until the defendant is prejudiced."  *United States v. Gonzalez-Lopez*, __ U.S. __, __, 126 S. Ct. 2557, 2563 (2006) (citing *Strickland*, 466 U.S. at 685).

---

[9] "Presumptions are pragmatic creations, 'rooted less in the absolute certitude that the presumption is true than in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.'"  *United States v. Moffeit*, 63 M.J. 40, 42 (C.A.A.F 2006) (Baker, J., concurring in the result) (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)).

*Ineffective Assistance of Counsel and Fourth Amendment Litigation*

Appellants asserting ineffective assistance claims involving Fourth Amendment motions carry the specific burden of showing that counsel's deficiency in performance regarding the motion, or failure to make the motion, prejudiced their case. As our superior court has reinforced, "[w]here a claim of ineffective assistance of counsel is based on 'defense counsel's *failure to litigate* a Fourth Amendment' objection to evidence, [to demonstrate actual prejudice] appellant 'must . . . prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence.'" *United States v. Loving*, 41 M.J. 213, 244 (C.A.A.F. 1994) (quoting *Kimmelman*, 477 U.S. at 375) (emphasis added) (third alteration in original); *see McConnell*, 55 M.J. at 482 (stating same regarding counsel's failure to move to suppress accused's statement). "Thus, while [appellant's] defaulted Fourth Amendment claim is one element of proof of his Sixth Amendment claim, the two claims have separate identities and reflect different [C]onstitutional values." *Kimmelman*, 477 U.S. at 375.

*Search Warrant Requirements*

A valid search warrant must be supported by "probable cause." Mil R. Evid. 315(f)(2) ("Probable cause to search exists when there is a reasonable belief that the person, property, or evidence sought is located in the place or on the person to be searched[,] . . . [and] may be based upon hearsay evidence in whole or in part[,] . . . [w]ritten . . . [or o]ral."); *United States v. Leedy*, 65 M.J. 208, 212–14 (C.A.A.F. 2007) (discussing same); *United States v. Long*, 64 M.J. 57, 61 (C.A.A.F. 2006) ("Official intrusions . . . in the military require search authorization supported by probable cause . . . ."); *United States v. Berry*, 90 F.3d 148, 153 (6th Cir. 1996) ("A valid search warrant may be issued only upon a finding of probable cause . . . ."); *see* Mil. R. Evid. 316(b) ("Probable cause to seize property or evidence exists when there is a reasonable belief that the property or evidence is . . . contraband . . . ."). The Supreme Court defines probable cause as "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). In determining whether probable cause exists, the issuing magistrate must make a "common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.*

A dog sniff can be determinative of probable cause. "'A positive indication by a properly-trained dog is sufficient to establish probable cause for the presence of a controlled substance.'" *United States v. Robinson*, 390 F.3d 853, 874 (6th Cir.

2004) (quoting *United States v. Diaz*, 25 F.3d 392, 393–94 (6th Cir. 1994)). The search warrant will be facially sufficient and establish the dog's reliability "if the affidavit states that the dog is trained and certified to detect narcotics." *United States v. Kennedy*, 131 F.3d 1371, 1376–77 (10th Cir. 1997); *Berry*, 90 F.3d at 153 (finding reference in affidavit that dog was "trained narcotics dog" was "sufficient to establish the training and reliability"). The affidavit does not have to state with any degree of particularity the "dog's track record or education." *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999).

### *Appellate Review of Search Warrants*

If the defense challenges a search warrant, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . [concluding]' that probable cause existed." *Gates*, 462 U.S. at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)) (alterations in original); *Leedy*, 65 M.J. at 213. We review the military judge's factually-derived "substantial basis" using a clearly-erroneous standard, and whether the "substantial basis" legally supports a probable cause determination de novo. *Leedy*, 65 M.J. at 212–13; *United States v. Bethea*, 61 M.J. 184, 187 (C.A.A.F. 2005) (stating same). Probable cause determinations are entitled to "great deference by reviewing courts." *Gates*, 462 U.S. at 236.

### *Challenging the Affidavit Supporting a Warrant—Franks Hearing*

A meritorious motion to suppress evidence—invalidating a search and seizure warrant because a government agent withheld or misrepresented material facts in the information provided to the authorizing official—requires the defense to overcome several hurdles. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978) ("We hold that, where the defendant makes a substantial preliminary showing that a false statement knowing[ly] and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the alleged false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request."); *see United States v. Wallace*, 14 M.J. 1019, 1023–24 (A.C.M.R. 1982), *pet. denied*, 16 M.J. 135 (C.M.A. 1983); *United States v. Lovell*, 8 M.J. 613, 616–17 (A.F.C.M.R. 1979) ("[T]he Supreme Court . . . permits an accused a hearing to go below the surface of a facially-sufficient affidavit . . . ."), *pet. denied*, 9 M.J. 17 (C.M.A. 1980).

Military Rule of Evidence 311(g)(2) codifies the Supreme Court's *Franks* decision by clarifying that when "the defense makes a substantial preliminary

showing that a government agent included a false statement[10] knowingly and intentionally or with reckless disregard for the truth in the information presented to [the magistrate issuing the warrant], and if the allegedly false statement is necessary to the finding of probable cause, the defense, upon request, shall be entitled to a [*Franks*] hearing." *See also United States v. Cravens*, 56 M.J. 370, 375 (C.A.A.F. 2002) (recognizing same). At the hearing, the defense must establish, by a preponderance of the evidence, "the allegation of knowing and intentional falsity or reckless disregard for the truth." Mil. R. Evid. 311(g)(2). Once that burden is met, the prosecution must prove, by a preponderance of the evidence, that without the false information, the "remaining information" provided to obtain the warrant from the magistrate sufficiently establishes probable cause. *Id*.

## Discussion

Appellant contends his trial defense team was ineffective because "they knew that Det. Pena had misled the magistrate when obtaining the warrant" regarding the drug-detector dog's certification, but "fail[ed] to attempt to suppress the marijuana" as evidence. Essentially, appellant asserts the first warrant obtained by Det. Pena to search the contents of the box for marijuana, and the second, anticipatory warrant obtained by Det. Jacque to search appellant's home for marijuana—in conjunction with the controlled delivery—were "invalid" because they were based on Det. Pena's "fraudulent affidavit."

We find no evidence of record to support the required "*substantial* preliminary showing" that Det. Pena "knowingly and intentionally" misled the magistrate in obtaining the first search warrant, *Franks*, 438 U.S. at 155 (emphasis added), or that his misstatements regarding the drug-detector dog's certification amounted to a "reckless disregard for the truth." *Id*. Although Det. Pena admitted he thought JB was certified—and did not discover anything to the contrary until after the Article 32 investigation—he stated the information he gave the magistrate "was in good faith [and i]t's not like I knew beforehand and I [was] trying to mislead the judge." He offered no information clarifying why he misstated JB's certification, or how he later found out he had been incorrect. Trial defense counsel did not pursue the matter any further on the merits other than through his limited

---

[10] Our superior court has applied this standard—used for *misrepresentations*—to *omissions* as well. *United States v. Figueroa*, 35 M.J. 54, 56–57 (C.M.A. 1992) (holding that "[o]missions do not 'undermine probable cause' unless they are intentional or made 'with reckless disregard for the' accuracy of the information. Merely 'negligent omissions' do not 'undermine' probable cause. *United States v. Martin*, 615 F.2d [318, 329 (5th Cir. 1980)].").

cross-examination. We find that including the misstatement in the affidavit constitutes, at best, an innocent mistake, or, at worst, simple negligence.

Detective Pena further explained at trial that "JB [had] been around for a while. . . . [O]ur dogs are certified on a yearly basis and it's a team effort. It's the canine and the officer that go through various tests . . . ." Moreover, Det. Pena's affidavit did not rely solely on JB's certification, but additionally informed the judge that Officer Fairbanks had been an El Paso police officer for fifteen years, had worked with JB for six months, and over this period, JB had successfully alerted to narcotics or narcotic-related currency over forty times.

The defense has offered no evidence tending to contradict Det. Pena's "good faith" assertions or the facts stated in the affidavit regarding JB's reliability, i.e., that JB had over forty successful alerts during the past six months. Based on the information contained in the affidavit and elicited from Det. Pena at trial, we find appellant has failed to persuasively marshal those facts and make the substantial threshold showing required to obtain a *Franks* hearing pursuant to Mil. R. Evid. 311(g)(2).[11] As the Supreme Court clarified in *Franks*:

> There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

438 U.S. at 171.

Moreover, we find the second part of the *Franks* analysis—whether, after the false information is set aside, the remaining material in the affidavit adequately establishes probable cause—cuts against appellant. The additional information provided in the affidavit adequately establishes probable cause. Regardless of whether JB was actually certified, the experience of JB's handler, coupled with JB's

---

[11] Appellant has the burden of proof on this point, and we will not speculate about the many possible explanations why JB was not certified. Nevertheless, appellant has not developed this information.

forty-plus successful alerts, provided the probable cause necessary to issue the search warrant.

We also find the second, anticipatory warrant to search appellant's New Orleans home depended upon the validity of the first (El Paso) warrant because the second warrant was based upon the assertion that the El Paso DEA Task Force, utilizing a drug-detection dog, "intercepted a package containing 4½ pounds of marijuana through Federal Express Parcel Service." Satisfied that Det. Pena's El Paso search warrant was valid, this court is also satisfied the second, anticipatory warrant to search appellant's home was also valid.

Based on our findings, appellant has failed to "'prove that his Fourth Amendment claim is meritorious and that there is a reasonable probability that the verdict would have been different absent the excludable evidence.'" *Loving*, 41 M.J. at 244 (quoting *Kimmelman*, 477 U.S. at 375). Appellant has, therefore, also failed to "show not only the deficiency in counsel's performance [by not moving to suppress the marijuana], but how that deficiency prejudiced his defense." *Dobrava*, 64 M.J. at 505. Hence, we find appellant received effective assistance of counsel from his trial defense team.

## LABORATORY REPORT

### Law

*Standard of Review*

This court ordinarily reviews a military judge's ruling regarding admissibility of evidence for abuse of discretion. *United States v. Datz*, 61 M.J. 37, 42 (C.A.A.F. 2005); *United States v. Gilbride*, 56 M.J. 428, 430 (C.A.A.F. 2002) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)); *see*, *e.g.*, *United States v. Johnston*, 41 M.J. 13, 16 (C.M.A. 1994) (admissibility of scientific evidence); *see generally* S. Childress & M. Davis, 2 Federal Standards of Review § 11.02 (2d ed. 1992) (evidentiary rulings reviewed for abuse of discretion). An abuse of discretion review entails examining a military judge's findings of fact using a clearly-erroneous standard and conclusions of law de novo. *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004).

When a military judge erroneously admits hearsay[12] evidence and violates an accused's Sixth Amendment right to confrontation—due to a deprivation of the right to cross-examination—the resulting error is an error of Constitutional dimension. *See United States v. Hall*, 58 M.J. 90, 94 (C.A.A.F. 2003) (finding Constitutional error where appellant was "denied her [C]onstitutional right of confrontation through cross-examination" of hearsay declarant). Moreover, to affirm the trial court's decision despite the erroneous admission, we must find such Constitutional error "harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967). "We review 'de novo' whether the '[C]onstitutional error was harmless beyond a reasonable doubt.'" *United States v. Gardinier*, 63 M.J. 531, 538 (Army Ct. Crim. App. 2006) (quoting *United States v. Kreutzer*, 61 M.J. 293, 299 (C.A.A.F. 2005)), *set aside and remanded*, 65 M.J. 60 (C.A.A.F. 2007); *see Arizona v. Fulminante*, 499 U.S. 279, 295 (1991); *United States v. Hall*, 56 M.J. 432, 436 (C.A.A.F. 2002); *United States v. Grijalva*, 55 M.J. 223, 228 (C.A.A.F. 2001); *United States v. George*, 52 M.J. 259, 261–62 (C.A.A.F. 2000). "The inquiry for determining whether [C]onstitutional error is harmless beyond a reasonable doubt is 'whether, beyond a reasonable doubt, the error did not contribute to the defendant's conviction or sentence.'" *Kreutzer*, 61 M.J. at 298 (quoting *United States v. Kaiser*, 58 M.J. 146, 149 (C.A.A.F. 2003), quoting *United States v. Davis*, 26 M.J. 445, 449 n.4 (C.M.A. 1988)). Specifically, "'[o]ur focus is not on whether the members were right in their findings but, rather, on whether the error had or reasonably may have had an effect upon the members' findings.'" *Hall*, 58 M.J. at 94 (quoting *United States v. Bins*, 43 M.J. 79, 86 (C.A.A.F. 1995)).

---

[12] Hearsay is an out-of-court statement being offered into evidence to prove the truth of the matter asserted in the statement. Mil. R. Evid. 801(c); *see* Mil. R. Evid. 802–805 (enumerating exceptions to the general prohibition against admitting hearsay as evidence); Mil. R. Evid. 807 (residual hearsay exception). "Although the right of confrontation and the hearsay rule stem from the same roots, they are not coextensive, and evidence admissible under a hearsay exception may still be inadmissible under the Confrontation Clause." *United States v. Palacios*, 32 M.J. 1047, 1051 n.5 (A.C.M.R. 1991), *rev'd*, 37 M.J. 366, 367–68 (C.M.A. 1993) (upholding lower court's finding that admission of child-victim's videotaped statement was erroneous, but finding admission not harmless beyond a reasonable doubt); *see California v. Green*, 399 U.S. 149, 155–56 (1970) (recognizing the overlap between hearsay rules and Confrontation Clause is not complete, and stating "we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception").

*Sixth Amendment Right to Confrontation*

The Sixth Amendment to the U.S. Constitution states: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The "Confrontation Clause" requires "the declarant to be physically present in the courtroom; physical presence allows the accused to confront the declarant in person, and cross-examine him in front of the trier of fact." *Gardinier*, 63 M.J. at 539 (citing *Ohio v. Roberts*, 448 U.S. 56, 65 (1980)); *Palacios*, 32 M.J. at 1049–50. Nevertheless, the *Roberts* Court held: "[H]earsay is admissible when the witness is unavailable and the hearsay either 'falls within a firmly rooted hearsay exception,' *see, e.g., White v. Illinois*, [502 U.S. 346, 355 (1992)], or has 'particularized guarantees of trustworthiness,' *see, e.g., Idaho v. Wright*, [497 U.S. 805, 820 (1990)]." *United States v. Bridges*, 55 M.J. 60, 62–63 (C.A.A.F. 2001) (citing *Roberts*, 448 U.S. at 66).[13]

In 2004, the Supreme Court issued its landmark decision in *Crawford*, 541 U.S. at 36, extending an accused's right to confront his accusers, by requiring trial judges to determine whether an unavailable declarant's out-of-court statements are "testimonial" or "nontestimonial" in nature. *Id*. at 67–68. The Court held that the Sixth Amendment's Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross examination." *Id*. at 53–54.

The U.S. Court of Appeals for the Armed Forces has further clarified that applying the *Crawford* analysis "depends on the meaning of 'testimonial,' [as well as] on the circumstances and context in which out-of-court statements are generated, and whether the out-of-court statements were made under circumstances that would lead an objective witness reasonably to believe the statement would be available for use at a later trial by the government." *United States v. Magyari*, 63 M.J. 123, 126 (C.A.A.F. 2006) (citing *Crawford*, 541 U.S. at 52).[14] Moreover, in deciding whether

---

[13] In appellant's case, the military judge admitted the laboratory report over defense objection, finding the self-authenticating document fell within the business records exception to the general rule barring admission of hearsay evidence. *See* Mil. R. Evid. 803(6) ("*Records of regularly conducted activity*").

[14] In *Crawford*, the Supreme Court identified three types of "testimonial" statements:

(continued . . .)

a statement "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *Crawford*, 541 U.S. at 52, is testimonial or nontestimonial, we must consider the following factors:

> First, was the statement at issue elicited by or made in response to law enforcement or prosecutorial inquiry? Second, did the "statement" involve more than a routine and objective cataloging of unambiguous factual matters? Finally, was the primary purpose for making, or eliciting, the statement[] the production of evidence with an eye toward trial?

*United States v. Rankin*, 64 M.J. 348, 352 (C.A.A.F. 2007). The *Rankin* Court based its factors on the analytical framework developed in *Davis v. Washington*, __ U.S. __, 126 S. Ct. 2266 (2007). Writing for the Court in *Davis*, Justice Scalia explained what might be called a "primary purpose" test for distinguishing between testimonial and nontestimonial statements:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the *primary purpose* of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that

---

(. . . continued)

> [1] *ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [and 3] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

541 U.S. at 51–52 (third alteration in original) (internal citations and quotation marks omitted); *Magyari*, 63 M.J. at 126.

the *primary purpose* of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id*. at 2273–74 (emphasis added).

The last of the *Rankin* Court's factors requires military courts to conduct a "contextual analysis" to determine "whether the primary purpose of the document [or statement] was prosecutorial in nature." *Foerster*, 65 M.J. at 124. "[O]ur goal is an objective look at the totality of the circumstances surrounding the statement to determine if the statement was made or elicited to preserve past facts for a criminal trial." *Gardinier*, 65 M.J. 60, 65 (C.A.A.F. 2007).

## Discussion

*Analysis of Crawford Principles*

Appellant contends the military judge erred by admitting the laboratory report (identifying the substance in the package appellant possessed as marijuana) as a business record in accordance with Mil. R. Evid. 803(6). This ruling, appellant argues, contradicts the *Crawford* Confrontation Clause requirements because the report is testimonial in nature. The question we must decide is whether the forensic laboratory report produced by the USACIL constitutes testimonial hearsay, or whether, in the alternative, the report represents nontestimonial hearsay subject to a reliability analysis under *Roberts*, 448 U.S. at 66. *See Magyari*, 63 M.J. at 126. Based on the *Crawford* landscape set forth by the U.S. Court of Appeals for the Armed Forces,[15] we must agree with appellant. Nevertheless, because "the *Crawford*

---

[15] *See Magyari*, 63 M.J. at 123; *Rankin*, 64 M.J. at 348; *Gardinier*, 65 M.J. at 60; *Foerster*, 65 M.J. at 120; *see also United States v. Harcrow*, __ M.J. __, 2007 CAAF LEXIS 767 (C.A.A.F. 2007) (granting review on the issue "whether the lower court erred by finding that two Virginia state forensic laboratory reports were not testimonial hearsay under *Crawford*"). We also note that while our decision comports with the views of some state courts, s*ee*, *e.g.*, *State v. Moss*, 2007 Ariz. App. LEXIS 86, *19 (Ariz. Ct. App. May 29, 2007) (concluding expert witness testimony, based on laboratory report produced for the "primary reason" of using the results "prosecutorially," was testimonial); *Johnson v. State*, 929 So.2d 4, 7 (Fla. Dist. Ct. App. 2005) (holding laboratory report establishing contraband nature of substance was testimonial); *Las Vegas v. Walsh*, 124 P.3d 203, 207–08 (Nev. 2005) (holding affidavit regarding blood draw for chemical analysis in impaired driving case was testimonial); *People v. Rogers*, 8 A.D.3d 888, 891 (N.Y. App. Div. 2004)

(continued . . .)

analysis is contextual, rather than subject to mathematical application of bright line thresholds[,]" *Rankin*, 64 M.J. at 352, our conclusion is limited to the facts of this case. Civilian law enforcement officers arrested appellant and seized the marijuana on 27 November 2002. The government preferred the charge and its specification on 4 April 2003, and the USACIL issued its laboratory report on 9 April 2003.

---

(. . . continued)

(holding blood test report was testimonial); *State v. Crager*, 844 N.E.2d 390, 394–400 (Ohio Ct. App. 2005) (holding DNA analysis report was testimonial because it was prepared "in anticipation of litigation"), *rev. granted*, 846 N.E.2d 532 (Ohio 2006), other state courts and our sister service court have divergent views, *see*, *e.g.*, *Bohsancurt v. Eisenberg*, 129 P.3d 471, 478–80 (Ariz. Ct. App. 2006) (holding calibration records for breathalyzer machine were nontestimonial business records); *Commonwealth v. Verde*, 827 N.E.2d 701, 705–06 (Mass. 2005) (holding laboratory report ("certificate of chemical analysis") of cocaine analysis fell within business records exception to the Confrontation Clause because it is "neither discretionary nor based on opinion[,] . . . state[s] the results of a well-recognized scientific test[,] . . . [and] admissible only as prima facie evidence of the composition, quality, and weight of the substance, . . . which a defendant may rebut") (internal citations omitted); *Crager*, 844 N.E.2d at 397–98 (stating laboratory reports "prepared and kept in the course of a regularly conducted business" are nontestimonial where they are not "wholly" and "solely" prepared for "litigation" or "prosecution"); *State v. Dedman*, 102 P.3d 628, 636 (N.M. 2004) (holding blood-alcohol report was nontestimonial, despite being prepared for trial, because "the process is routine, non-adversarial, and made to ensure an accurate measurement"); *United States v. Harris*, 65 M.J. 594, 2007 CCA LEXIS 12, *15–*18 (N.M. Ct. Crim. App.) (finding laboratory urinalysis report nontestimonial, even though single sample submitted "under a probable cause premises," because "lab personnel . . . would have no way of knowing either the testing premise or the identity of the individual[,] . . . whether prosecution was anticipated[,] or whether the sample was part of a normal random urinalysis screening"), *pet. filed*, 65 M.J. 13 (C.A.A.F. 2007); *United States v. Harcrow*, 2006 CCA LEXIS 285, *15–*18 (N.M. Ct. Crim. App. 30 Oct. 2006) (unpub.) (finding forensic laboratory chemical analysis reports, positively indicating presence of "heroin and cocaine," were "non-testimonial and were admissible under the business records hearsay exception"). Additionally, in describing the historical development of Sixth Amendment Confrontation Clause case law, Justice Scalia also noted: "Several [hearsay exceptions] had become well established by 1791[, but m]ost of the hearsay exceptions covered statements that by their nature were *not testimonial*—for example, *business records* or statements in furtherance of a conspiracy." *Crawford*, 541 U.S. at 56 (internal citations omitted) (emphasis added).

19

Therefore, we base our conclusion primarily on the fact that the "statement" is a *post*-apprehension[16] laboratory report, requested *after* local police arrested appellant.

The military judge found the laboratory report was a properly-authenticated business record, and, as such, was admissible under Mil. R. Evid. 803(6). Pursuant to trial counsel's request, and aided by Fort Bliss CID special agents, the laboratory conducted a forensic examination of the marijuana to generate evidence for use at appellant's court-martial, i.e., "with an eye toward trial." *Rankin*, 64 M.J. at 352; *see Foerster*, 65 M.J. at 123–25 (finding victim's forgery affidavit was nontestimonial because it was made to ensure bank would not be defrauded and victim would receive reimbursement for stolen funds, not with view towards a criminal trial). The laboratory performed the examination "with the forensic needs of law enforcement and prosecution in mind." *Gardinier*, 65 M.J. at 66. The laboratory technician in appellant's case was "engaged in a law enforcement function, a search for evidence in anticipation of prosecution or trial[,]" and the report was "prepared at the behest of law enforcement" while appellant was "already under investigation, and where the testing [was] initiated by the prosecution to discover incriminating evidence." *Magyari*, 63 M.J. at 126–27 (internal citation omitted).

Moreover, although we find generating the USACIL forensic report akin to an "objective cataloging of unambiguous factual matters[,]" *Rankin*, 64 M.J. at 352, i.e., the identity and amount of a controlled substance,[17] we also find the laboratory technician's "statements" responded to a law enforcement inquiry, and the "primary purpose for making, or eliciting, the [report]" was to produce evidence "with an eye toward trial," i.e., the report was produced months after appellant's arrest, and after the government preferred the charge alleging narcotics possession with intent to distribute. *Id*. Accordingly, we hold the laboratory report was testimonial and its admission into evidence at the court-martial erroneous. This does not, however, end our inquiry. We must now determine whether the military judge's erroneous admission of the laboratory report was harmless beyond a reasonable doubt.

---

[16] "Apprehension is the taking of a person into custody." R.C.M. 302(a)(1). "Apprehension is the equivalent of 'arrest' in civilian terminology." R.C.M. 302(a)(1) discussion. Apprehension is also considered a type of "pretrial restraint." R.C.M. 304(a)(3).

[17] *See Verde*, 827 N.E.2d at 705 (finding chemical analysis certificate "admissible only as prima facie evidence of the composition, quality, and weight of the substance").

*Harmless Beyond a Reasonable Doubt*

In reviewing de novo the military judge's decision to admit the laboratory report, we must determine "'whether the error had[,] or reasonably may have had[,] an effect upon the members' findings.'" *Hall*, 58 M.J. at 94 (quoting *Bins*, 43 M.J. at 86). We must find this Constitutional error was "harmless beyond a reasonable doubt" to affirm appellant's conviction. *Chapman*, 386 U.S. at 24. After setting aside the laboratory report, which identified the marijuana and its weight, and considering the remaining evidence properly admitted at trial, we are convinced beyond a reasonable doubt that the military judge's error in admitting the laboratory report was harmless, i.e., it did not reasonably have an effect upon the members' findings.

At trial, the government presented substantial reliable evidence other than the laboratory report pertaining to each element of the offense of possession of a controlled substance with intent to distribute. *See* UCMJ art. 112a. The military judge recognized Det. Pena, a DEA Task Force member, "as an expert in the field of narcotics interdiction[,] . . . includ[ing] distribution and transportation." Detective Pena had been working for the El Paso Police Department for fourteen and a half years, including six years "specifically [with] drugs [and] narcotics." He also received extensive training from the DEA, the Texas Narcotics Officers Association, and the El Paso Police Department in "narcotics, undercover [operations, drug] interdiction, and various [other] topics." Detective Pena "[c]onducted several undercover buys[,] . . . bought, sold, and purchased different types of narcotics," conducted "hundreds" of interviews, made "hundreds" of arrests, participated in "hundreds" of investigations, and secured "hundreds" of search warrants. As a narcotics detective, Det. Pena "taught or trained . . . new officers that would come into the . . . narcotics interdiction . . . unit." He testified "[q]uite a few [times] . . . in civilian court . . . as an expert [qualified] . . . in narcotics[-]related fields."

Based on his training and experience, Det. Pena testified that "transporting marijuana through Fed Ex" is a common method of shipping "large quantities of marijuana" because "of the low risk to the sender." The sender can present a "prepackaged . . . box[ for shipping,] . . . pay [his] money, and [he is] out of there." He also said: "[I]f [the package] gets through the line, . . . [and] gets delivered[,] it's a done deal. A very low risk of getting caught . . . . If that package is intercepted, . . . you have a bogus address on it, . . . [and] no leads."

Officer Fairbanks—another DEA Task Force member, fifteen-year veteran of the El Paso Police Department, and dog handler—along with the third member of the team, Officer Vargas, discovered the suspiciously-addressed box at the Federal Express terminal with the aid of his "K-9 partner," drug-detector dog JB (arguably the fourth member of the Task Force team). JB had been working with Officer

Fairbanks for six months and, during that time, "alerted successfully on over 40 occasions where narcotics or narcotic[-]related currency ha[d] been seized." Detective Pena told the panel: "JB [has] been around for a while . . . [and is] certified on a yearly basis[;] . . . it's a team effort." "[T]he canine and the officer," he stated, "go through various tests" set forth by two different certification associations, NAPWDA and NNDDA, to ensure the dog can "detect the odor of marijuana, cocaine, heroin and methamphetamine."

After JB alerted on the suspicious box, Officers Fairbanks and Vargas took the box into police custody, and the DEA Task Force team obtained a search warrant. They then opened the box and examined its contents. Detective Pena and trial counsel discussed the box's contents in the following colloquy:

> Q. What did you find inside when you opened the box?
>
> A. There was a roll of toilet paper. There was two--there was bundles of marijuana wrapped in black tape.
>
> Q. I'm showing you what has also been marked [P.E.] 14 for identification, the toilet paper wrapper with all the rolls of toilet paper and the duct tape . . . .
>
> A. And then it was secured onto the toilet paper with the duct tape.
>
> Q. What was secured onto the toilet paper?
>
> A. The marijuana.
>
> Q. How much marijuana?
>
> A. 4.95 pounds.
>
> . . . .
>
> Q. I'm showing you what's previously been marked [P.E.] 17 for identification. What is it?
>
> A. [Examining [P.E.] 17 for ID.] It's marijuana.
>
> Q. How do you recognize it?

22

A. Well, I recognize the black tape that it was wrapped in.

. . . .

Q. Is this the marijuana that you previously handled when you opened this box?

A. Yes, ma'am.

Q. And when and where did you receive this [marijuana]?

A. On the 25th of November [2002].

Q. And where were you?

A. El Paso, Texas, at the Fed Ex location.

Q. And how did you safeguard this [marijuana]?

A. It was in the custody of our officers at the Task Force.

Q. Which Officers?

A. Fairbanks and Vargas.

. . . .

Q. These are the people you transferred the marijuana to?

A. Yes, ma'am.

Q. As best you can tell, is this the marijuana that you took out of this box [holding up [P.E.] 14 for ID]?

A. Yes, ma'am.

Q. As best you can tell, is this the marijuana that you took out of this box [holding up [P.E.] 14 for ID] that was attached to these rolls of toilet paper which were in this package?

A. Yes, ma'am.

The military judge admitted P.E. 14 (a photo of the box) and P.E. 17 (a clear, plastic bag containing the seized marijuana) into evidence over defense objection.  The panel received these exhibits for examination during its deliberations on findings.

The panel also received the DEA Task Force police report (D.E. R), prepared by Officer Fairbanks on 25 November 2002 (before the 9 April 2003 laboratory report was prepared), which states, in pertinent part:

> [Officer Fairbanks], a certified narcotics canine handler, was utilizing his canine "JB" to sniff through outbound freight [at the Federal Express terminal].  "JB" had alerted positive on [a box] for the scent of narcotics. . . . After obtaining a search warrant, . . . [the] Officers opened the box[] and located three (3) bundles of marijuana with the gross approximate weight of 4.95 pounds.  The bundles of marijuana were wrapped in black tape.  The bundles were attached with duct tape to "Soft n Touch" toilet paper.

Detective Pena further told the panel marijuana is shipped with toilet paper "to mask the odor" of the drug and "to throw off the dog."  Although he did not test the substance to confirm it was marijuana, Det. Pena and the other Task Force members knew they discovered a package containing marijuana at the Federal Express terminal.  Detective Pena elaborated upon this knowledge for the panel in further questioning by trial counsel.  The following colloquy ensued:

> Q.  Backing up a little, did you test the marijuana once you opened the package?
>
> A.  No, ma'am.
>
> Q.  Why not?
>
> A.  It's not a police department policy to test marijuana.
>
> Q.  But you knew it was marijuana?
>
> A.  Right . . . based on our knowledge and experience with marijuana, we based it on that.

Detective Jacque, a New Orleans narcotics detective, also told the panel he weighed the marijuana, which he described as "three separate[,] . . . hard and compressed . . . pieces of material . . . resemble[ing] . . . brick[s] or . . . bundles."  The three bricks, he said, weighed "more than [three] pounds."  Furthermore, Det.

Jacque and Det. Pena testified that, in their professional opinions, a person possessing three to four pounds of marijuana intends to distribute it, not to personally use it.

After examining P.E. 17, SA Hernandez also told the panel it contained the originally-tagged drug evidence he forwarded to the USACIL for testing. When asked by assistant trial counsel, "[W]hat[,] to your trained eye[,] does that appear to be inside that bag?" agent Hernandez answered, "It appears to be bundles of marijuana . . . tape, plastic bags, and a tag from [the] New Orleans P[olice] D[epartment]." He also said he "sent marijuana off to be tested at the lab . . . [c]ountless times," and that a "brick" of marijuana "is where they take the marijuana, they compact it into brick type moldings[,] and they look like a brick. It's all compressed."

Appellant's own conduct and words further indicate criminal intent. When the police executed the search warrant at appellant's home, appellant appeared "shocked and nervous," and was initially quiet. Appellant gave Det. Jacque and Det. Lockhart several conflicting explanations why someone would send a box of marijuana to his house: he was expecting CDs in the mail; a friend was going to mail him a package (but he never asked about the contents); another friend that was "into marijuana" could have just sent the package; "he didn't know anything about anything;" and this all could have been a set up.

Additionally, the defense theory of the case was that appellant did not knowingly possess marijuana because he was not involved in sending it to his grandmother's house, and did not know the box contained marijuana before he was arrested. The evidence admitted at trial, however, suggests otherwise. Appellant considered himself a rap music artist of sorts,[18] and his defense relied upon the

---

[18] Notably, assistant trial counsel cross-examined appellant regarding some of his song lyrics, which included: "Moved up from packaging boy to the transporter;" "Got big figures and big bundles;" "Some call me dope man and I'm a dope man;" "Don't be surprised when you get six when you ask for five;" "I'm in my house at night trying to cook it right and trying to cut it right and trying to get it right;" "Don't think you can arrest me or test me." When asked if he was "talking about drug dealing," appellant responded, "It's metaphors. . . . This is metaphors that relate to music." Assistant trial counsel also reminded appellant that when the government moved to admit into evidence and play one of appellant's CDs for the panel, the military judge sustained a defense objection to the request. Assistant trial counsel then asked appellant why the defense objected to playing these songs. Despite being tried by court-martial on a single specification of possession of

(continued . . .)

possibility that a competing artist sent the drugs to him, without his knowledge, to set him up for a drug conviction and eliminate him as a competing artist. The box had a FedEx USA Airbill® attached to it with the name "Will" and appellant's grandmother's address. The package also arrived at that address precisely during the short period appellant was on leave in New Orleans for the Thanksgiving holiday, 17–30 November 2002, as indicated by appellant's leave form (admitted into evidence as D.E. G).

Based on the foregoing evidence, even in the absence of the cumulative laboratory report, the panel had substantial reliable evidence to support appellant's conviction. The members were free to make witness-credibility determinations, give relative weight to witness testimony and physical evidence, believe or disbelieve witness testimony, and draw reasonable inferences from the evidence presented.[19] In this light, we are confident the military judge's error in admitting the laboratory report did not affect the members' findings of guilty. Therefore, the error was harmless beyond a reasonable doubt.

## CONCLUSION

Appellant has not shown a motion to suppress the marijuana based on defective search warrants would have been meritorious had his defense team made one at trial. Appellant has not met his burden of demonstrating a deficiency in counsel's performance with resulting prejudice. Furthermore, under the circumstances of this case, the laboratory report confirming the presence of marijuana was testimonial under the principles of *Crawford* and, therefore, was improperly admitted as a business record under Mil. R. Evid. 803(6). The military judge's erroneous admission of the laboratory report, however, was harmless beyond a reasonable doubt.

---

(. . . continued)
marijuana with intent to distribute, appellant said, "[I]t doesn't relate to this. This is not what I'm being on trial for." Assistant trial counsel then reminded appellant: "You're being on trial for the distribution of narcotics . . . [a]nd your songs deal with the distribution of narcotics . . . ."

[19] *See*, *e.g.*, *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007) ("[I]t is axiomatic that credibility determinations are within the province of the members."); *United States v. Ford*, 23 M.J. 331, 335 (C.M.A. 1985) (drawing an inference "is a question to be decided by the factfinder using the standard of reasonable doubt").

WILLIAMSON – ARMY 20030855

The findings of guilty and the sentence are affirmed.

Judge ZOLPER and Judge WALBURN concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

27